IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

| ANNE MARIE CORDES, | ) | CIVIL ACTION NO. 9:09-1576-RBH-BM |
|---|---|---|
| Plaintiff, | ) ) ) | |
| v. | ) ) | **REPORT AND RECOMMENDATION** |
| MICHAEL J. ASTRUE, COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | ) ) ) ) ) | |
| Defendant. | ) ) | |

The Plaintiff filed the complaint in this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the final decision of the Commissioner wherein she was denied disability benefits. This case was referred to the undersigned for a report and recommendation pursuant to Local Rule 73.02(B)(2)(a), (D.S.C.).

Plaintiff applied for Disability Insurance Benefits (DIB) on February 1, 2006, alleging disability as of January 1, 2004 due to chronic neck and low back pain. (R.pp. 116, 135). Plaintiff's claim was denied initially and upon reconsideration. Plaintiff then requested a hearing before an Administrative Law Judge (ALJ), which was held on September 16, 2008. (R.pp. 27-66). The ALJ thereafter denied Plaintiff's claim in a decision issued October 15, 2008. (R.pp. 7-26). The Appeals Council denied Plaintiff's request for a review of the ALJ's decision, thereby making the determination of the ALJ the final decision of the Commissioner. (R.pp. 1-4).



Plaintiff then filed this action in United States District Court. Plaintiff asserts that there is not substantial evidence to support the ALJ's decision, and that the decision should be reversed and remanded for an award of benefits. The Commissioner contends that the decision to deny benefits is supported by substantial evidence, and that Plaintiff was properly found not to be disabled.

### Scope of review

Under 42 U.S.C. § 405(g), the Court's scope of review is limited to (1) whether the Commissioner's decision is supported by substantial evidence, and (2) whether the ultimate conclusions reached by the Commissioner are legally correct under controlling law. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990); Richardson v. Califano, 574 F.2d 802, 803 (4th Cir. 1978); Myers v. Califano, 611 F.2d 980, 982-983 (4th Cir. 1980). If the record contains substantial evidence to support the Commissioner's decision, it is the court's duty to affirm the decision. Substantial evidence has been defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. **If there is evidence to justify refusal to direct a verdict were the case before a jury, then there is "substantial evidence."** [emphasis added].

Hays, 907 F.2d at 1456 (citing Laws v. Celebrezze, 368 F.2d 640 (4th Cir. 1966)).

The Court lacks the authority to substitute its own judgment for that of the Commissioner. Laws, 368 F.2d at 642. "[T]he language of [405(g)] precludes a de novo judicial proceeding and requires that the court uphold the [Commissioner's] decision even should the court disagree with such decision as long as it is supported by substantial evidence." Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir. 1972).



## Discussion

A review of the record shows that Plaintiff, who was forty (40) years old when she alleges her disability began, has a high school education with some post high school training and past relevant work experience as a machinist and production worker. (R.pp. 33, 56, 116, 146). In order to be considered "disabled" within the meaning of the Social Security Act, Plaintiff must show that she has an impairment or combination of impairments which prevent her from engaging in all substantial gainful activity for which she is qualified by her age, education, experience and functional capacity, and which has lasted or could reasonably be expected to last for at least twelve (12) consecutive months. After review of the evidence and testimony in the case, the ALJ determined that, although Plaintiff does suffer from several "severe" impairments[1], rendering her unable to perform her past relevant work, she nevertheless retained the residual functional capacity (RFC) to perform a limited range of light work[2] activity, and was therefore not disabled. (R.pp. 12, 16-17, 23).

Plaintiff asserts that in reaching this decision, the ALJ erred by failing to properly evaluate the opinions of Dr. Edward Norton, one of Plaintiff's treating physicians, by failing to consider the combined effect of Plaintiff's multiple impairments, and by conducting an improper credibility analysis. However, after careful review and consideration of the evidence and arguments presented, the undersigned finds and concludes that there is substantial evidence in the record to support the conclusion of the ALJ that Plaintiff was not disabled as that term is defined in the Social

---

[1] An impairment is "severe" if it significantly limits a claimant's physical or mental ability to do basic work activities. See 20 C.F.R. § 404.1521(a); Bowen v. Yuckert, 482 U.S. 137, 140-142 (1987).

[2] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b) (2005).



Security Act during the relevant time period, and that the decision of the Commissioner should therefore be affirmed.

I.

**(Evidence of Physical Impairment)**

Plaintiff's previous relevant work were heavy jobs requiring lifting of up to one hundred pounds; (R.pp. 56, 146); and in 2004 Plaintiff began complaining of pain in her shoulders, arms and hands. However, Plaintiff's treating physician, Dr. Marcus Schaefer, repeatedly opined during this period of time that Plaintiff was able to work, and in fact his clinic notes from June 2004 indicate that Plaintiff was still working at her job.[3] (R.pp. 248-249, 253, 256, 259). X-rays performed on June 8, 2004 found some minimal early disc space narrowing, although no fracture or bony destruction was demonstrated, and Plaintiff's vertebral and prevertebral body heights and remaining disc spaces were unremarkable. (R.pp. 305-306). After electro diagnostic studies revealed findings consistent with carpal tunnel syndrome, Dr. Richard Gordon restricted Plaintiff to lifting no more than ten to twenty pounds with an avoidance of repetitive grasping and fine manipulation. (R.pp. 232-235). Thereafter, in work recommendations issued on July 26, 2004, Dr. Schaefer restricted Plaintiff to pulling and lifting less than five pounds with further restrictions on frequent hand and wrist movements. (R.p. 243). However, by August 4, 2004, Dr. Schaefer had released Plaintiff back to work with no restrictions. (R.p. 237).

Plaintiff was examined on September 23, 2004, by Dr. Jon DeVries (an orthopedic surgeon) for complaints of bilateral hand numbness, tingling and pain. On examination Plaintiff was found to have full range of motion in her spine and shoulders, Plaintiff's biceps and triceps were 5/5



---

[3]This was six (6) months *after* Plaintiff's alleged disability onset date.

4

(full strength) bilaterally, and she had full range of motion in both wrists and elbows. While Plaintiff did exhibit some pain at extremes, Dr. DeVries noted that x-rays showed no sign of fracture, avulsion or dislocation, no arthritic changes about the wrist or hand, and a normal left shoulder with no underlying disorders. Plaintiff's cervical spine showed only minimal early disc disease at C5-6 without acute bony abnormalities. (R.p. 296). An MRI conducted the following week revealed only a small central disc protrusion at the C3-4 level, a small right paracentral disc protrusion at the C4-5 level, and a small disc bulge at the C5-6 level. (R.p. 303).

Dr. DeVries subsequently performed left carpal tunnel release and left thumb surgery on the Plaintiff on November 3, 2004. (R.pp. 307-308). Two months post surgery Plaintiff's wounds were well healed. However, Plaintiff complained of "shooting pain that goes through both arms and legs intermittently," and stated that she did not feel she could "return to her normal job. . . ." Dr DeVries opined that he could not "fully explain" Plaintiff's complaints of continued discomfort, but he restricted Plaintiff to a twenty pound lifting limit in her left upper extremity for two weeks. (R.p. 291). Shortly thereafter, examination notes from a physician's assistant, Chris Schafer, dictated January 26, 2005, noted that on physical examination Plaintiff was found to have 5/5 strength in her biceps, triceps, deltoid, wrist flexors and extensors bilaterally, although Plaintiff continued to complain of neck, arm and hand pain, particularly when performing overhead activities for prolonged periods of time. Plaintiff was given a work note "for activities as tolerated". (R.p. 553).

On February 23, 2005, Plaintiff began seeing Dr. Nolan, a pain specialist. Plaintiff complained to Dr. Nolan that her pain had decreased her ability to participate in physical activities by ninety to one hundred percent, social activities by seventy to eighty percent, and sexual activities



5

by ninety to one hundred percent. On examination, Dr. Nolan found Plaintiff to be moderately obese, well groomed with a normal affect, and oriented X 3. Plaintiff's deep tendon reflexes were intact, she had normal coordination, and normal range of motion in her shoulders, hips and knees. Her left and right upper extremity motor strength was 4/5, and she exhibited moderate limited range of motion in her neck and in her thoraco/lumbar/sacrum region with moderate pain in the bilateral greater occipital nerve distribution. Plaintiff complained of severe pain in her bilateral paraspinous and trapezius muscles, and was diagnosed with a cervical disc displacement and cervical radiculitus. Plaintiff was scheduled for an ultra sound and lumbar MRI. (R.pp. 373-374). The MRI was performed five (5) days later, and showed Plaintiff's vertebral bodies to be grossly normal in height and alignment with normal sign characteristics. Plaintiff was diagnosed with mild degenerative facet changes, with no focal disc protrusion or high grade stenosis. (R.pp. 379-380).

Plaintiff returned to see Dr. Nolan on March 9, 2005, complaining of constant sharp pain in her neck, both arms, low back, legs, and down the spine. However, on examination Plaintiff was found to have normal coordination gait and muscle tone bilaterally in her upper and lower extremities, with other findings consistent with her visit of February 23, 2005. (R.p. 370). Another visit a week later resulted in similar findings. (R.p. 368). Plaintiff received a trigger point injection as well as electrical stimulation and an ultrasound during that appointment. Id. Subsequent visits continued to reflect similar findings, although by April 6, 2005 Plaintiff exhibited only 3/5 left upper extremity motor strength. (R.pp. 364, 366). On May 9, 2005, Plaintiff complained of severe pain in her right elbow and right wrist, and on June 13, 2005 she received lumbar facet joint and sacro-iliac joint injections. (R.pp. 359, 362).

On June 9, 2005, Plaintiff returned to see Dr. DeVries complaining of burning pain



6

and swelling about her hand. Plaintiff reported that epidural steroid injections were giving her relief from her arm pain, but that she still had some residual hand pain, numbness and tingling. On examination, Plaintiff was found to have full range of motion about her right thumb with no catching, locking or triggering, and full range of motion about the elbow, forearm, wrist and hand. Strength was 5/5, and x-rays revealed no sign of fracture, avulsion or dislocation, or evidence of osseous impingement about the carpal tunnel. There was also no evidence of carpal instability, and Plaintiff's distal radial ulna joint was well aligned. A cockup wrist splint was provided for night splinting. (R.p. 290).

Over the next six months, Plaintiff continued to be followed at the Trident Pain Center, where she continued to receive treatment and occasional trigger point injections. Her physical condition remained basically the same, with Plaintiff having normal coordination, gait and muscle tone, and generally mild to moderate pain, although she would occasionally exhibit severe pain in her upper extremities. (See generally, R.pp. 346-347, 349-351, 353, 355, 357). At the request of Dr. Nolan, Plaintiff underwent a functional capacity evaluation on September 23, 2005. Plaintiff's lifting tolerances were found to be in the ten pound range, with occasional use of her hands and left foot, and an ability to sit up to four hours in a work day, and walk and stand for three hours each in a work day. However, the assessment specialist reported to Dr. Nolan that Plaintiff had only made a submaximal effort, and noted that the assessment and functional overview generally represented the levels Plaintiff *perceived* as her capability, even though she may actually have been able to do more physically. See generally, (R.pp. 516-518). Despite this questionable assessment and the lack of change in Plaintiff's condition as reflected in his own treatment notes, Dr. Nolan wrote a "to whom it may concern" letter on January 11, 2006 stating that he had been treating the



7

Plaintiff for chronic neck and low back pain which started in 2003, and that she was unable to work due to the limitations caused by her pain and restricted mobility. (R.p. 345).

On June 1, 2006, state agency medical consultant Dr. George Keller reviewed Plaintiff's medical records and opined that Plaintiff had the lifting ability for light work, and that she could stand about six hours in an eight hour work day, sit about six hours in an eight hour work day, with a limited ability to push and/or pull in her upper extremities. He further opined that Plaintiff could frequently balance, but could only occasionally stoop, kneel, crouch, crawl, climb ramps/stairs, and never climb ladders, ropes, or scaffolds. He also believed Plaintiff had an unlimited ability for gross and fine manipulation, although only a limited ability to reach, including overhead. (R.pp. 428-434). A second state agency medical consultant, Dr. Jean Smolka, essentially reached the same conclusions after review of Plaintiff's medical records on November 21, 2006, although she did believe that Plaintiff was limited in her ability to push and/or pull in her lower extremities, and had only a limited ability for gross and fine manipulation. (R.pp. 455-460).

Dr. Nolan's records for the period August 2006 through April 2008 continue to reflect that Plaintiff had a normal gait, coordination, and muscle tone in her arms and legs, with some decreased arm strength but otherwise generally normal strength. (R.pp. 570, 573, 576, 578, 581, 583-585, 589, 605, 607, 615). Nevertheless, Dr. Nolan wrote another "to whom it may concern" letter on July 2, 2007, stating that Plaintiff was unable to perform jury duty due to her condition. (R.p. 583). Dr. Nolan wrote a third "to whom it may concern" letter on December 11, 2008 in which he opined that Plaintiff had a 51% cervical impairment, a 17% lumbar impairment, a 10% upper extremity impairment for each wrist, and a combined whole person impairment of 37%. Dr. Nolan stated that Plaintiff had been "determined to be unable to return to work at her previous job as a



8

machinist" and that he did not believe she would be able to sustain work at even a sedentary level "if her job required frequent, repetitive hand movements or keyboarding." He also believed Plaintiff's concentration levels were limited due to her pain and/or effects of medication, and that she would be likely to miss more than four days of work per month due to the combination of pain and effects of medication. (R.pp. 663-664).

## II.

### (Evidence of Mental Impairment)

Although Dr. Nolan routinely found Plaintiff to be in no apparent distress, well groomed with normal affect, and oriented x3, following a visit to the Pain Center on November 18, 2005 she was referred for an evaluation of anxiety, depression and stress tolerance. (R.p. 349). It is not clear whether this referral was pursued, however, as the same notation appears on the report of her office visit of December 5, 2005. (R.p. 347). Plaintiff was then seen the following day by Dr. William Kee, a clinical psychologist. Plaintiff complained of debilitating pain, stated that she had bilateral wrist braces but did not wear them because she did not believe they helped, and reported that she did not exercise, although she did spend one or two hours a day doing chores around the house, although with difficulty. Plaintiff complained of being depressed "on a daily basis", but denied any problems with memory, concentration, delusions, or hallucinations, and she was found to be oriented in all three spheres. She also denied suicidal ideation, intent, or plan, but reported that she often had "crying spells" and experienced anxiety about finances and taking care of her children. She had no symptoms of panic attacks, phobia, mania, or post traumatic stress disorder.

Dr. Kee diagnosed Plaintiff with major depression, an adjustment disorder with anxious mood, a pain disorder associated with medical and psychological factors, and assigned her



9

a GAF of 60.[4] See generally, (R.pp. 397-399). Dr. Kee opined that Plaintiff could benefit from individual psychotherapy to work on her cognitive and behavioral techniques for the management of pain, depression, anxiety, and stress, and he thereafter saw Plaintiff for nine (9) psychotherapy sessions between December 2005 and June 2006. These sessions appeared to help, as they reflect that Plaintiff was handling stress better, that she was planning to have more "fun" in her life such as going out to eat and to the "flower festival" and planning a weekend in Myrtle Beach with friends, that she was relaxing better, reported that she was going shopping, and that she was walking one mile two to three times a week. See generally, (R.pp. 400-408).

On July 17, 2006, a consultative psychiatric examination of the Plaintiff was performed by Dr. Vidya Upadhyaya. Plaintiff reported that she had been depressed "for a few years", and that she was "in constant pain all the time . . . ." However, it was noted that Plaintiff had no history of psychiatric hospitalizations, suicide attempts, or history of being on any psychiatric medications, and on examination Plaintiff was found to be alert and oriented, with no evidence of suicidal or homicidal ideation, or auditory or visual hallucinations. Plaintiff was able to perform serial 7's without any problems, and on memory testing was able to remember three out of three objects at one minute, and one out of three objects at three minutes. Dr. Upadhyaya diagnosed Plaintiff with a major depressive order and a current GAF of 55-60. Dr. Upadhyaya further noted that Plaintiff had not been seen by a psychiatrist or received a psychiatric evaluation or received any treatment for depression, and opined that Plaintiff would benefit from a referral to a psychiatrist.

---

[4]"Clinicians use a GAF [Global Assessment of Functioning] to rate the psychological, social, and occupational functioning of a patient." Morgan v. Commissioner of Soc. Sec. Admin., 169 F.3d 595, 597 n.1 (9th Cir. 1999). A GAF of 51 to 60 indicates that only moderate symptoms are present. Perry v. Apfel, No. 99-4091, 2000 WL 1475852 at *4 (D.Kan. July 18, 2000); Matchie v. Apfel, 92 F.Supp.2d 1208, 1211 (D.Kan. 2000).



10

(R.pp. 411-413).

Plaintiff also had her medical records reviewed by two state agency psychologists. On June 30, 2006, Dr. Judith Von opined that Plaintiff's mental impairments were not severe, and that Plaintiff had only mild restrictions in her activities of daily living, maintaining social functioning, and maintaining concentration, persistence or pace, with no episodes of decompensation. (R.pp. 414, 424). In November 2006, Dr. Jeffery Vidic reached the same conclusions. (R.pp. 440, 450). Additionally, examination reports from Dr. Nolan from August 2006 through April of 2008 generally reflected that Plaintiff had a normal mental status. See generally, (R.pp. 570, 573, 576, 578, 585, 589, 605, 607, 615). On September 11, 2008, Dr. Nolan completed a medical assessment of ability to do work related activities (mental), in which he opined that Plaintiff had a fair ability to deal with work stress; understand, remember and carry out both detailed and complex job functions; with a poor ability to maintain attention/concentration. He also believed Plaintiff had an unlimited ability to understand, remember and carry out simple job instructions, to maintain personal appearance, to behave in an emotionally stable manner, to relate predictability in social situations, and demonstrate reliability. Dr. Nolan offered no opinion on Plaintiff's ability to follow work rules, relate to coworkers, deal with the public, use judgement, interact with supervisors, or function independently. See (R.pp. 657-658).

### III.

### (ALJ's RFC Findings)

After a review of these medical records and consideration of Plaintiff's subjective testimony; see (R.pp. 12-23); the ALJ found and concluded that Plaintiff suffers from cervical disc displacement, cervical radiculitis, lumbar facet arthropathy, lumbar radiculpathy, myofascial pain,



11

history of bilateral carpal tunnel surgeries, and obesity, which were all severe impairments. With respect to Plaintiff's mental impairment, the ALJ concluded that Plaintiff's depression did not cause more than minimal limitation in the Plaintiff's ability to perform basic mental work activities, and was therefore non-severe. (R.pp. 12-13). Based on these findings, the ALJ concluded that Plaintiff retained the residual functional capacity to perform light work activity which requires only occasional climbing, stooping, kneeling, crouching, crawling, and performing overhead reaching, bilaterally; frequently balancing and doing fine and gross manipulation with the right upper extremity; and never climbing ropes, ladders, or scaffolds. The ALJ further found that Plaintiff could perform a combination of sitting, standing, and walking during an eight hour work day, as long as she was not required to do any of those activities for longer than thirty minutes at a time. Finally, although the ALJ found Plaintiff's depression to be non-severe, he nevertheless limited the Plaintiff to routine and repetitive work with only occasional public contact. (R.pp. 16-17).

In reaching this decision, the ALJ noted the findings of Dr. Kee showing that Plaintiff had no problem with memory or concentration, that she was fully oriented, and did well during her psychotherapy sessions. The ALJ also noted Dr. Nolan's medical records generally reflecting normal mental status exams, the results of Dr. Upadhyaya's consultative psychiatric evaluation, the fact that Plaintiff engaged in social activities including trips and caring for her children, and that she had never sought treatment at a mental health facility. (R.pp. 13-14). See Gross v. Heckler, 785 F.2d 1163, 1166 (4th Cir. 1986) ["[A] psychological disorder is not necessarily disabling. There must be a showing of related functional loss."]; Foster v. Bowen, 853 F.2d 483, 489 (6th Cir. 1988) [A mental impairment diagnosis is insufficient, standing alone, to establish entitlement to benefits.]. The ALJ further gave significant weight to the opinions of the state agency psychological



12

consultants, both of whom found that Plaintiff had no severe mental impairment. (R.p. 23). See SSR 96-6p [Agency Physicians are experts in the evaluation of medical issues for purposes of disability claims]. As for Plaintiff's physical limitations, the ALJ carefully reviewed the medical evidence, including the findings of Drs. Schaefer, Gordon and DeVries, the results of Plaintiff's MRIs, the functional assessments from Trident Sports Medicine & Rehabilitation, and the findings of the state agency medical consultants, showing that Plaintiff was able to work, had only minimal findings on her MRIs, and had good results from surgery. The ALJ also discussed and analyzed Dr. Nolan's medical records, noting his routine findings of normal coordination, gait and muscle tone, and taking into account her decreased upper extremity muscle strength.[5] (R.pp. 19-23).

The records and opinions of Plaintiff's treating and examining physicians discussed hereinabove provide substantial evidence to support the residual functional capacity found by the ALJ; see Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1993) [ALJ may properly give significant weight to an assessment of an examining physician]; Richardson v. Perales, 402 U.S. 389, 408 (1971) [assessment of examining, non-treating physicians may constitute substantial evidence in support of a finding of non-disability]; as do the opinions of the state agency physicians. Smith v. Schweiker, 795 F.2d 343, 345 (4th Cir. 1986) [opinion of a non-examining physician can constitute substantial evidence to support the decision of the Commissioner].

---

[5]While the ALJ did misidentify a physical capacities report of May 22, 2007 as having been authored by Dr. Nolan, when it was in fact authored by Dr. Timothy Zgleszewski; see R.pp. 22, 587; this error does not warrant a remand of this case. A review of the ALJ's decision shows that he extensively discussed Dr. Nolan's medical records and findings in reaching his decision, specifically noting where the medical evidence did not support a finding of disability in this case.



13

## III.

### (Dr. Nolan's Opinion of Disability)

Although Dr. Nolan opined that Plaintiff was unable to work; see (R.pp. 345, 663-664); the ultimate issue of disability is reserved to the Commissioner. Castellano v. Secretary of Health & Human Servs., 26 F.3d 1027, 1029 (10th Cir. 1994) [physician opinion that a claimant is totally disabled "is not dispositive because final responsibility for determining the ultimate issue of disability is reserved to the [Commissioner]"]. The ALJ further gave only limited weight to Dr. Nolan's physical assessment of ability to do work related activities (physical) completed on September 11, 2008, in which Dr. Nolan opined that Plaintiff could only occasionally lift and carry up to ten pounds, with no ability above that level and limiting Plaintiff to only occasionally balancing with no stooping, crouching, kneeling, or crawling. The ALJ determined that these conclusions were inconsistent even with Dr. Nolan's own examination findings, which routinely noted that Plaintiff had normal muscle strength and tone, with only slightly less muscle strength in the right upper extremity, and further noting that Plaintiff engages in such activities as household chores, grocery shopping, traveling, and driving. (R.pp. 22-23).

The undersigned does not find any reversible error in the ALJ's decision to discount many of Dr. Nolan's conclusions as to the extent of Plaintiff's pain and limitations, when considered in conjunction with the other evidence of record and Dr. Nolan's own treatment notes. See Craig v. Chater, 76 F.3d 585, 589-590 (4th Cir. 1996) [rejection of treating physician's opinion of disability justified where the treating physician's opinion was inconsistent with substantial evidence of record]; Burch v. Apfel, 9 Fed.Appx. 255 (4th Cir. 2001) [ALJ did not err in giving physician's opinion little weight where the physician's opinion was not consistent with her own progress notes.];



14

Hays, 907 F.2d at 1456 [it is the responsibility of the ALJ to weigh the evidence and resolve conflicts in that evidence].

### IV.

### (Consideration of Impairments in Combination)

Plaintiff's argument that the decision should be reversed because the ALJ failed to adequately consider the effects of Plaintiff's limitations in combination is also without merit. A review of the ALJ's decision shows that he thoroughly discussed all of the medical evidence as well as Plaintiff's subjective testimony in making his decision, even crediting Plaintiff with restrictions in her overall RFC for impairments the ALJ found to be non-severe. (R.pp. 15-23). Hays, 907 F.2d at 1456 [it is the responsibility of the ALJ to weigh the evidence and resolve conflicts in that evidence]; see Thomas v. Celebrezze, 331 F.2d 541, 543 (4th Cir. 1964) [court scrutinizes the record as a whole to determine whether the conclusions reached are rational].

The decision also details the ALJ's analysis of how these impairments affect Plaintiff's residual functional capacity, including the "combination" of Plaintiff's impairments. Mickles v. Shalala, 29 F.3d 918, 925-926 (4th Cir. 1994) [In assessing the credibility of the severity of reported subjective complaints, consideration must be given to the entire record, including the objective and subjective evidence]. Plaintiff's complaint that the ALJ did not consider the combined effects of her impairments on her ability to work is essentially predicated on the ALJ having only used the word "combination" one time. (R.p. 15). However, a plain reading of the decision reflects the thorough review and consideration given by the ALJ to the evidence and the effects of all of the Plaintiff's impairments in deciding her RFC. Cf. Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir. 1992) [ALJ properly considered whether claimant's impairments in combination were disabling by



15

separately discussing claimant's impairments]; Oliver v. Astrue, No. 08-886, 2009 WL 1766007 at * 9 (D.S.C. June 22, 2009); Martise v. Astrue, No 08-1380, 2010 WL 889826 at * 23 (E.D. Mo. Mar. 8, 2010); Miller v. Astrue, No. 08-62, 2009 WL 2762350 at * * 13-14 (E.D.Mo. Aug. 28, 2009); Waxvik v. Apfel, No. 99-152, 2001 WL 1820373 at * 4 (D.N.D. Mar. 12, 2001); Vasey v. Astrue, No. 08-46, 2009 WL 4730688 at * 5 (E.D.Ark. Dec. 3, 2009); Isaacs v. Shalala, No. 92-4101, 1994 WL 247276 at * 5 (N.D. Iowa Mar. 11, 1994) Wilfong v. Shalala, No. 93-472, 1994 WL 780186 at * 4 (D.Minn. Oct. 18, 1994). This argument is without merit.

## V.

### (Credibility Findings)

Finally, Plaintiff's argument that the ALJ conducted an improper credibility analysis is without merit. In making his findings, the ALJ noted Plaintiff's activities, including driving, doing housework and grocery shopping, going to the movies and working on a computer, taking trips, and visiting friends. (R.pp. 35-38, 404-408) The ALJ also noted Plaintiff's testimony concerning the extent of her pain and limitations, including that she cannot walk very far and can only stand about fifteen to twenty minutes, but found that Plaintiff's statements concerning the intensity, persistence and limiting effects of symptoms was not fully credible to the extent they were inconsistent with the objective medical evidence, which did not support the extent of her claimed limitations. See (R.pp. 237, 290, 296, 370, 379-380, 400-408, 414, 424, 428-434, 440, 450, 455-456). The ALJ specifically noted that examinations have shown normal tone, intact muscle strength, and intact sensation, evidence which is inconsistent with Plaintiff's subjective testimony. See generally (R.pp. 14, 17-18, 22). With respect to Plaintiff's argument that the ALJ disregarding the disabling effects of medications, it should be pointed out that the ALJ discussed in his decision the fact that the medical



16

evidence consistently reflects that Plaintiff was found during her examinations to be alert, oriented x3, that she was able to remember and carry out job instructions, that her memory was intact, and that indeed Plaintiff herself denied any problems with her memory or with concentration. (R.pp. 13-14).

In sum, after a review of the decision and the record in this case, the undersigned does not find that the ALJ conducted an improper credibility analysis, or that his decision otherwise reflects a failure to consider the combined effect Plaintiff's impairments had on her ability to work. See Thomas, 331 F.2d at 543 [court scrutinizes the record as a whole to determine whether the conclusions reached are rational]; Hunter 993 F.2d at 35 [ALJ may properly consider inconsistencies between a plaintiff's testimony and the other evidence of record in evaluating the credibility of the plaintiff's subjective complaints]; Jolley v. Weinberger, 537 F.2d 1179, 1181 (4th Cir. 1976) [finding that objective medical evidence, as opposed to the claimant's subjective complaints, supported an inference that he was not disabled]; Mickles, 29 F.3d at 925-926 (4th Cir. 1994) [In assessing the credibility of the severity of reported subjective complaints, consideration must be given to the entire record, including the objective and subjective evidence]; Cruse v. Bowan, 867 F.2d 1183, 1186 (8th Cir. 1989) ["the mere fact that working may cause pain or discomfort does not mandate a finding of disability"]; cf. Browning, 958 F.2d at 821 [ALJ properly considered whether claimant's impairments in combination were disabling by separately discussing claimant's impairments]; Gross, 785 F.2d at 1166["[A] psychological disorder is not necessarily disabling. There must be a showing of related functional loss."]; Foster, 853 F.2d at 489 [A mental impairment diagnosis is insufficient, standing alone, to establish entitlement to benefits.]. No reversible error has been shown in the ALJ's credibility findings.



## Conclusion

Substantial evidence is defined as " ... evidence which a reasoning mind would accept as sufficient to support a particular conclusion." Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984). As previously noted, if the record contains substantial evidence to support the decision (i.e., if there is sufficient evidence to justify a refusal to direct a verdict were the case before a jury), this Court is required to uphold the decision, even should the Court disagree with the decision. Blalock, 483 F.2d at 775.

Under this standard, the record contains substantial evidence to support the conclusion of the Commissioner that the Plaintiff was not disabled within the meaning of the Social Security Act during the relevant time period. Therefore, it is recommended that the decision of the Commissioner be **affirmed**.

Bristow Marchant
United States Magistrate Judge

June 21, 2010
Charleston, South Carolina

18